Case No. 2023-2346

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
_____

LYNK LABS, INC.,
*Appellant,*

v.

SAMSUNG ELECTRONICS CO., LTD.,
*Appellee,*

KATHERINE K. VIDAL, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL
PROPERTY AND DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE,
*Intervenor.*

_____

On Appeal from the United States Patent and Trademark Office
in IPR2022-00149

_____

### SECOND CORRECTED BRIEF OF AMICUS CURIAE
### PUBLIC INTEREST PATENT LAW INSTITUTE
### IN SUPPORT OF APPELLEE SAMSUNG AND AFFIRMANCE

_____

Alex H. Moss
PUBLIC INTEREST PATENT LAW INSTITUTE
79405 Hwy 111 Ste 9-414
La Quinta, CA 92253
Tel: (818) 281-2191
alex@piplius.org

*Counsel for Amicus Curiae*

May 15, 2024

**FORM 9. Certificate of Interest**                           Form 9 (p. 1)
                                                              March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-2346 |
| **Short Case Caption** | Lynk Labs, Inc. v. Samsung Electronics Co. Ltd. |
| **Filing Party/Entity** | Public Interest Patent Law Institute |

---

**Instructions:**

1.  Complete each section of the form and select none or N/A if appropriate.

2.  Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3.  In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4.  Please do not duplicate entries within Section 5.

5.  Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/15/2024                Signature:  /s/ Alex H. Moss

                                Name:       Alex H. Moss

**FORM 9. Certificate of Interest**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Public Interest Patent Law Institute | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable         ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)     ☐   No     ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable         ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST.................................................................... i

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES..................................................................... v

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT...................................... 2

ARGUMENT ....................................................................................... 3

I. The Public Has an Overwhelming Interest in Preserving the Prior Art Effect of Published Patent Applications in IPR Proceedings. .................................................. 3

A. Patent Applications Are Invaluable Sources of Information. ............................. 3

B. Published Patent Applications Are Available to Examiners and Effective on Filing; Prior Public Availability Is Not Required..................................................... 5

C. Published Patent Applications Protect the Public Domain, Benefiting Technology Creators and Users.................................................................... 7

D. The Current Treatment of Published Patent Applications in IPR Proceedings Is Critical to the Public's Ability to Mitigate Harmful Effects of Invalid Patents..... 10

E. The Public Has a Strong Interest in Ensuring IPR Proceedings Can Do What Congress Intended: Improve Patent Quality............................................................. 13

CONCLUSION ................................................................................... 14

CERTIFICATE OF COMPLIANCE ................................................................ 16

CERTIFICATE OF SERVICE..................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander Milburn Co. v. Davis Bournonville Co.*, 270 U.S.390, 402 (1926) .... 4

*Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272  (2016) ........................... 14

*In re Cronyn,* 890 F.2d 1158, 1160 (Fed. Cir. 1989) ........................................... 6

*In re NuVasive, Inc.*, 841 F.3d 966, 968 (Fed. Cir. 2016) .................................. 13

*In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)........................................................ 6

*Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018) ................................................................................................................. 5

*Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1346 (Fed. Cir. 2024)........... 13

*Regents of the Univ. of Minnesota v. LSI Corp.*, 926 F.3d 1327, 1332 (Fed. Cir. 2019) ..................................................................................................... 10, 14

*Voice Tech Corp. v. Mycroft AI, Inc.*, No. 2023-1033 (Fed. Cir., May 6, 2024) 11

## Other Authorities

157 Cong. Rec. S1361–62  (daily ed. Mar. 8, 2011) ........................................... 13

Christopher A. Cotropia & David L. Schwartz, *The Hidden Value of Abandoned Applications to the Patent System*, 61 BOSTON COLL. L. REV. 2809, 2846 (2020).................................................................................................... 3, 4, 5

Charles Duan, *On the Appeal of Drug Patent Challenges*, 2 AM. U. L. REV. 1177 (2023) ........................................................................................................... 12

Exhibit G to Jacobs Declaration, *Uniloc USA, Inc. v. Apple, Inc.*, No. 3:18-cv-00360-WHA (N.D. Cal.), Dkt. No. 268-4 (Sept. 21, 2022)........................... 11

James Gatto, *Patent Attacks Against Open Source Intensify!*, INTELLECTUAL PROPERTY LAW BLOG, Oct. 14, 2019 ............................................................... 8

E. Harris, *Survey: Millions of People in the US Forgo Medications to Reduce Costs*, 330 J. AM. MED. ASS'N 1:13 (2023) ...................................................... 12

Josh Landau, *A Little More Than Forty Percent: Outcomes At The PTAB, District Court, and the EPO*, PATENT PROGRESS, May 1, 2018 .................... 10

Josh Landau, *Inter Partes Review: Five Years, Over $2 Billion Saved*, PATENT PROGRESS, Sept. 14, 2017 .............................................................. 10

PATENT PANDAS, *Crowdfunding Backer Patented My Project*, Nov. 29, 2018 ... 9

Richard Coller III and Alexander Covington, IP WATCHDOG, *Defensive Publications: A Cost-Effective Tool to Supplement Your Patent Strategy* (May 25, 2020) ......................................................................................................... 8

Thomas Claburn, *Alarm raised after Microsoft wins data-encoding patent*, THE REGISTER, Feb. 17, 2022 .................................................................................. 9

U.S. PATENT & TRADEMARK OFFICE, *U.S. Patent Activity: Calendar Years 1790 to the Present*, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/h_counts.htm (last visited May 9, 2024). .................................................................................................... 3

Victor Van De Wiele, Aaron Kesselheim, and Sean Tu, *Biologic patent challenges under the America Invents Act*, 42 NATURE BIOTECHNOLOGY 374–377 (2024) .................................................................................................... 13

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE[1]

The Public Interest Patent Law Institute (PIPLI) is a nonprofit, nonpartisan organization dedicated to ensuring the patent system promotes innovation for the public's benefit.[2]

As detailed in the accompanying motion, members of the public beyond the parties have a strong interest in ensuring that published patent applications remain effective as prior art upon filing in inter partes review (IPR) proceedings. This rule ensures the public can challenge and the Patent and Trial Appeal Board (PTAB) can cancel patents which should not have issued, increasing the quality of granted patents and mitigating harm caused by those granted erroneously.

If published applications became effective prior art in IPR proceedings only after publication, that would reduce the scope of viable prior art, and ensure invalid patents avoid or survive review. The result would be more invalid patents and more meritless lawsuits, but less protection for the public domain and less space for future innovation. The public has a strong interest in preventing that outcome, and thus in ensuring published patent applications retain their current prior art effect in IPR proceedings.

---

[1] No party or party's counsel authored this brief, in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.
[2] Further details about the identity and interest of amicus are in the motion for leave accompanying this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, published patent applications have been effective as prior art from their filing dates. This rule applies to all published applications, regardless of whether they ultimately become granted patents, and in all proceedings where patentability determinations are made. It should remain in place.

Published patent applications are valuable sources of information. They shed light on a patent applicant's own work as well as the level of knowledge in the field at the time of an application's filing. They help examiners make patentability determinations. They allow patent applicants and other inventors to protect their own freedom to operate and that of their users. When they fail to prevent patents from erroneously issuing, they nevertheless make it possible to correct those errors in IPR proceedings.

IPR proceedings produce invaluable public benefits. By facilitating the cancellation of invalid patents, IPRs remove undue barriers to research and competition, spurring the development of better and more affordable offerings for consumers. But the public will only obtain these benefits if prior art references, including published patent applications, remain as available and effective in IPR proceedings as they are today and have always been.

## ARGUMENT

### I.     The Public Has an Overwhelming Interest in Preserving the Prior Art Effect of Published Patent Applications in IPR Proceedings.

#### A.     Patent Applications Are Invaluable Sources of Information.

Published patent applications are valuable sources of information. They describe the applicant's claimed invention as well as other advances in the field at the time of the application's filing. As such, they are crucial references for anyone making patentability determinations, including patent examiners, inventors, researchers, attorneys, and judges.

Published patent applications are also abundant. The USPTO receives more than 600,000 new patent applications each year,[3] many of which will become published applications, but not granted patents. According to the above-referenced study, 20% of patent applications filed between 2000 and 2020 were published but not granted—nearly a million applications in total.[4] Published patent applications are indeed a "universe of prior art." USPTO Br. at 1.

---

[3] U.S. PATENT & TRADEMARK OFFICE, *U.S. Patent Activity: Calendar Years 1790 to the Present*, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/h_counts.htm (last visited May 9, 2024).

[4] Christopher A. Cotropia & David L. Schwartz, *The Hidden Value of Abandoned Applications to the Patent System*, 61 BOSTON COLL. L. REV. 2809, 2846 (2020); *see also* HTIA Br. at 21–22 (reporting that about 100,000 more applications are published than issued as patents per year).

Practically speaking, patent applications take effect upon filing. Once filed with the USPTO, they are official records establishing a particular technological advance (the applicant's claimed invention) at a particular time (the application's filing date). As such, filed applications affect the patentability of claims in other applications. If an applicant claims an advance that was already described in an application, the applicant who arrives second at the USPTO cannot qualify as the inventor, and therefore is not entitled to a patent. *See Alexander Milburn Co. v. Davis Bournonville Co.*, 270 U.S.390, 402 (1926) (recognizing the "fundamental rule . . . that the patentee must be the first inventor"); *see also* USPTO Br. at 4 (quoting *Milburn*).[5]

Empirical research confirms the significant impact of published applications during examination. One recent study found that examiners frequently cite published applications as prior art when evaluating other claims.[6] In fact, examiners cite published applications *more* than granted patents, especially in obviousness determinations, where they cite published applications

---

[5] *See also* Cotropia & Schwartz, *supra* note 4, at 2832 ("If someone else invents the same thing later in time, the second inventor did not provide a new disclosure to society, and has not invented anything new.").

[6] *Id.* at 2848. (Results showed that "[e]xaminers cite to abandoned applications (1.384) more than issued patents (1.140)," and that "abandoned applications are used more than issued patents in both anticipation (0.141 to 0.102) and obviousness (0.612 to 0.332) rejections by the USPTO.")

twice as often.[7] The data led the researchers to conclude that published applications have features which make them uniquely useful to examiners.[8]

Published patent applications are also uniquely valuable in post-issuance patentability determinations in court. As official public records, they are self-authenticating documents and exempt from hearsay rules.[9] That means published applications can serve as evidence without witnesses to authenticate them and can establish the truth of what they assert—including the fact that an application was filed on a particular date.

Given the accessibility, abundance, and usefulness of published patent applications, their availability is critical to IPR's effectiveness in facilitating the accurate review and cancellation of patents which should not have issued.

### B.     Published Patent Applications Are Available to Examiners and Effective on Filing; Prior Public Availability Is Not Required.

This Court has emphasized, rightly, that *non-patent* documents must be publicly available to be effective prior art references. *See, e.g.*, *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018). That makes sense. Printing and publishing a document does not ensure that "persons interested and

---

[7] *Id.* at 2850.

[8] For example, researchers found that published applications often "combined the teachings from multiple other pieces of prior art in one place" so that an "examiner does not need to rely on multiple pieces of prior art." *Id.* at 2851.

[9] *Id.* at 2857–58.

ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it." *Id.* (internal quotation marks and citation omitted). Only if a printed publication is also publicly available can its accessibility to ordinarily skilled artisans in the field be assured.

There is no need for such assurance in the case of published patent applications. The act of filing an application ensures its availability to examiners. Filing thus does for patent applications what publication by itself cannot do for non-patent documents: it effectuates and proves access to people of ordinary skill in the art—i.e., examiners in the relevant technology center.

The public's interest in encouraging disclosure also aligns with the public availability requirement for non-patent publications. If a non-patent publication is unavailable, examiners cannot access it, and the public has an interest in encouraging others to disclose the same or similar information in patent applications. Preventing unavailable publications from serving as prior art thus advances the public's interest in encouraging disclosure of their contents.

By contrast, if a publication is available, the public has access to its contents, and no interest in encouraging further disclosure. Instead, the public has an interest in preventing the issuance of patents on the publication's contents, which would otherwise be freely available for others to use. *See In re Cronyn,* 890 F.2d 1158, 1160 (Fed. Cir. 1989) ("[T]he printed publication provision was

designed to prevent withdrawal by an inventor, as the subject matter of a patent, of that which was already in the possession of the public.") (quoting *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)). Permitting publicly available publications to be effective prior art references thus serves the public's interest in preventing the issuance of later-filed claims on their contents.

It is irrelevant that the public will get access to a published patent application approximately 18 months after examiners. What matters is that, upon filing, the information in an application is available to examiners, including to use as prior art when evaluating other applications. Once filed, an application can and should prevent the issuance of later-filed claims which it would anticipate or render obvious. Even though publication may occur later, the public begins to benefit from disclosures in patent applications from the time they are filed.[10]

### C.     Published Patent Applications Protect the Public Domain, Benefiting Technology Creators and Users.

Because published patent applications are effective prior art references upon filing, they provide valuable protection for the public domain, benefiting patent applicants and members of the public alike.

---

[10] While applicants may request non-publication on the condition that they do not seek patent protection in other countries, 35 U.S.C. § 122(b)(2)(B), relatively few do, HTIA Br. at 4, n.2. Regardless, such applications still become available to examiners upon filing, and therefore should prevent the issuance of later-filed claims.

Applicants who do not obtain patents still benefit from having their applications become prior art upon filing. Once effective, a patent application can and should prevent third parties from subsequently obtaining patents on the same subject matter. In so doing, they encourage applicants to continue innovating and operating in the field by reducing the risk of incurring liability to others. This protective or defensive function of published patent applications is an important benefit that often plays a role in patenting strategies, particularly among startups and small businesses.[11]

This protective effect also provides incentives for technology developers who might not otherwise participate in the patent system to do so. For example, developers of open source technology strive to make their work available to members of the public to use and build on freely. Because they do not want to exclude others from their work, the promise of exclusive rights does not inspire open source developers to disclose their work in patent applications. But because these developers want to ensure public access to their work, the protective effect

---

[11] Richard Coller III and Alexander Covington, IP WATCHDOG, *Defensive Publications: A Cost-Effective Tool to Supplement Your Patent Strategy* (May 25, 2020), https://ipwatchdog.com/2020/05/25/defensive-publications-cost-effective-tool-supplement-patent-strategy/id=121862/ ("Filing a patent application serves the dual purpose of creating a prior art document while also preserving the option to pursue patent protection. If . . . the technology remains low value, but still core technology, the applicant may allow the patent application to lapse after publication, still achieving the goal of having the defensive publication while cutting off future patent prosecution costs.").

of patent applications does.

Concerns about third-party attempts to obtain patents on the work of other open source developers are well-founded. Too often, innovations of open source developers have become subjects of patents to subsequently obtained by others.[12] Because published patent applications help examiners reject unpatentable claims and members of the public the challenge invalid patents, amicus regularly advises open source developers to consider filing patent applications to protect public access to their work.

The strength of this protection, however, depends on the prior art effect of published patent applications. Treating published patent applications as effective prior art in IPRs only upon publication would substantially reduce their usefulness, weakening the protection they provide. Published applications can only provide their current protective effect if they retain their current prior art effect, including in IPR proceedings.

While applicants can request expedited publication, *see* 35 U.S.C.

---

[12] James Gatto, *Patent Attacks Against Open Source Intensify!*, INTELLECTUAL PROPERTY LAW BLOG, Oct. 14, 2019, https://www.intellectualpropertylawblog.com/archives/open-source-patent-infringement/; Thomas Claburn, *Alarm raised after Microsoft wins data-encoding patent*, THE REGISTER, Feb. 17, 2022, https://www.theregister.com/2022/02/17/microsoft_ans_patent/; PATENT PANDAS, *Crowdfunding Backer Patented My Project*, Nov. 29, 2018, https://patentpandas.org/stories/crowdfunding-backer-patented-my-project.

§ 122(b)(1), the statute does not specify how much expedition is possible or required. Regardless, the USPTO cannot reasonably be expected to publish an application on the same day an applicant submits it. No matter how expedited, publication will occur after filing. Treating published applications as effective upon publication rather than filing in IPR proceedings will necessarily reduce the effectiveness of those proceedings and prevent the cancellation of invalid patents.

**D.    The Current Treatment of Published Patent Applications in IPR Proceedings Is Critical to the Public's Ability to Mitigate Harmful Effects of Invalid Patents.**

Unfortunately, patent applications do not always prevent others from obtaining patents on subject matter which they disclose. Given the USPTO's workload and resources, *see supra* at 3, "it is inevitable that there are patents granted in error." *Regents of the Univ. of Minnesota v. LSI Corp.*, 926 F.3d 1327, 1332 (Fed. Cir. 2019); *see also id.* n.6. These errors are not rare: studies show that approximately 40% of granted patents are found invalid when challenged.[13]

These errors matter. Wrongly granted patents cause severe harm to people's lives and livelihoods. One type of harm results from actual and threatened litigation premised on invalid patents. Because patent litigation is exorbitantly expensive—with the cost of a low stakes case estimated at over $700,000—

---

[13] Josh Landau, *A Little More Than Forty Percent: Outcomes At The PTAB, District Court, and the EPO*, PATENT PROGRESS, May 1, 2018, https://www.patentprogress.org/2018/05/a-little-more-than-forty-percent/.

mounting a defense, however meritorious, may most more than small businesses can bear.[14] Accordingly, many small businesses pay settlements solely to avoid litigation. As one such business has put it: "We agreed to settle this [patent] case . . . not because of its merits but because of the high cost of defense and the risk of a trial to our small company."[15]

Compared to district court litigation, IPR proceedings are relatively affordable. Their median cost is $250,000—about one-third the cost of a low stakes patent lawsuit.[16] Because they are much more affordable than defensive litigation in court, IPRs are crucial mechanisms for people and organizations with limited resources facing infringement lawsuits or litigation threats premised on patents of questionable validity.

But the value of IPR proceedings hinges on the PTAB's capacity to consider relevant prior art and cancel invalid patents. Delaying the effective date of published patent applications would reduce the scope of viable prior art in IPR proceedings, which would, in turn, reduce the PTAB's capacity to cancel patents

---

[14] Josh Landau, *Inter Partes Review: Five Years, Over $2 Billion Saved*, PATENT PROGRESS, Sept. 14, 2017, https://www.patentprogress.org/2017/09/inter-partes-review-saves-over-2-billion/.

[15] Exhibit G to Jacobs Declaration, *Uniloc USA, Inc. v. Apple, Inc.*, No. 3:18-cv-00360-WHA (N.D. Cal.), Dkt. No. 268-4 (Sept. 21, 2022), at 5, available at: https://www.eff.org/files/2022/09/26/2022-09-21_notice_dckt_268_4.pdf.

[16] Landau, *supra*, note 13.

which should not have issued and which it can cancel now.[17]

Further harm results from the use of power that invalid patents confer unduly. The statutory requirements of novelty and non-obviousness ensure that the powerful rights patents provide are granted only to those whose contributions merit them. But when granted patents fail those requirements, their owners get power to which they are not entitled. When they use these wrongly patents to drive drug prices up so that patients ration or forego care,[18] the public has a strong interest in ensuring those patents can be challenged fairly and effectively.

Empirical research confirms that IPRs allow people to mitigate drug pricing crises when wrongly granted patents create or exacerbate them. One study found that IPRs leading to the cancellation of drug patents led to steep and swift reductions in the prices of affected drugs.[19] For example, after an IPR led to the cancellation of patents covering prasugrel, a treatment for cardiovascular disease, the drug's price fell by 97%.[20] Similarly, after IPR led to the cancellation of

---

[17] For example, this Court recently affirmed a PTAB decision where it found a patent obvious in an IPR based on prior art references including a published patent application. *See Voice Tech Corp. v. Mycroft AI, Inc.*, No. 2023-1033 (Fed. Cir., May 6, 2024) (Rule 36 affirmance).

[18] E. Harris, *Survey: Millions of People in the US Forgo Medications to Reduce Costs*, 330 J. AM. MED. ASS'N 1:13 (2023), doi:10.1001/jama.2023.10395.

[19] Charles Duan, *On the Appeal of Drug Patent Challenges*, 2 AM. U. L. REV. 1177 (2023), available at: https://ssrn.com/abstract=4406404 or http://dx.doi.org/10.2139/ssrn.4406404.

[20] *Id.* at 1204–05.

patents on abiratone acetate, a prostate cancer treatments, its price fell by 80% to 90%.[21] Another recent study has validated the usefulness of IPR proceedings in mitigating harm that wrongly granted patents on biologic treatments cause, particularly, undue delays on the availability of more affordable biosimilars.[22]

Although these studies do not discuss the types of prior art at issue, published applications regularly support IPR petitions on patents covering medical treatments, as this Court is aware. *See, e.g.*, *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1346 (Fed. Cir. 2024) (obviousness finding based on combination of prior art references that included a published application); *In re NuVasive, Inc.*, 841 F.3d 966, 968 (Fed. Cir. 2016) (obviousness findings based on combinations of prior art references that included a published application). Curtailing the effective date of published patent applications would reduce the scope of prior art available in IPRs, and thereby reduce the public's ability to lower drug prices when invalid patents drive them to unjustifiable heights.

### E.    The Public Has a Strong Interest in Ensuring IPR Proceedings Can Do What Congress Intended: Improve Patent Quality.

Congress created IPR proceedings for an important reason: to improve the

---

[21] *Id.* at 1203–04.

[22] Victor Van De Wiele, Aaron Kesselheim, and Sean Tu, *Biologic patent challenges under the America Invents Act*, 42 NATURE BIOTECHNOLOGY 374–377 (2024), https://doi.org/10.1038/s41587-024-02156-9.

quality of granted patents and prevent wasteful litigation over invalid patents.[23] Indeed, the Supreme Court and this Court have recognized that these goals drove the creation of IPR proceedings in the America Invents Act of 2011 (AIA).[24]

Given Congress's overriding goal of improving patent quality and its specific intent to maintain the scope of the inter partes reexamination proceedings that predated IPR,[25] it is unreasonable to read the AIA as creating an IPR-specific restriction on the use of published patent applications. Congress intended IPRs to be an efficient mechanism for challenging invalid patents, not shielding them from relevant prior art. Yet that is exactly what delaying the effective date of published patent applications in IPR proceedings would do. Nothing could be further from Congress's intent or the public's interest in improving patent quality.

## CONCLUSION

For the foregoing reasons, amicus respectfully urges the Court to confirm

---

[23] Statement of Sen. Leahy, 157 Cong. Rec. S1361–62 (daily ed. Mar. 8, 2011) ("The America Invents Act will accomplish 3 important goals, which have been at the center of the patent reform debate from the beginning: It will improve and harmonize operations at the PTO; it will improve the quality of patents that are issued; and it will provide more certainty in litigation.").

[24] *See, e.g., Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272 (2016) (recognizing "one important congressional objective, namely, giving the Patent Office significant power to revisit and revise earlier patent grants") (citations omitted); *LSI*, 926 F.3d at 1335 ("In 2011, Congress enacted the Leahy-Smith America Invents Act . . . to improve patent quality and limit unnecessary and counterproductive litigation costs.") (internal quotation marks and citation omitted).

[25] *See* USPTO Br. at 9–10.

that published patent applications are effective as prior art from their filing dates,

including in IPR proceedings.

May 15, 2024

Respectfully submitted,

<u>/s/ Alex H. Moss</u>

Alex H. Moss
PUBLIC INTEREST PATENT LAW INSTITUTE
79405 Hwy 111 Ste 9-424
La Quinta, CA 92253
Tel: (818) 281-2191
alex@piplius.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify as follows:

1.     The foregoing Brief of Amicus Curiae Public Interest Patent Law Institute in Support of Appellee complies with the type-volume limitation of Fed. Cir. R. 35(g). The brief is printed in proportionally spaced 14-point type, and there are 3,257 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), that is, the tables of contents and citations, and certificates of counsel, and by Fed. Cir. R. 32(b), that is, the certificate of interest, the statement of related cases, and the addendum in an initial brief of an appellant).

2.     The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Mac 2016 in 14-point Times New Roman font.

Dated: May 15, 2024                    /s/ Alex H. Moss
                                       Alex H. Moss

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 15, 2024, I caused the foregoing to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

Dated: May 15, 2024                                    <u>/s/ Alex H. Moss</u>
                                                                   Alex H. Moss